HEILBRONNER, RESPONDENT, *v.* LLOYD, APPELLANT.

[Submitted November 4, 1895.  Decided December 2, 18.5.]

CHATTEL MORTGAGES—*Validity—Sales by mortgagor—Instructions.*—In an action to recover a stock of merchandise, taken under an attachment against the mortgagor, where the mortgage prohibited the mortgagor from selling the goods, an instruction, in effect, that the goods would not pass by the mortgage if it was understood that they should remain in the possession of the mortgagor, and be sold in the ordinary course of trade, unless the mortgagee took possession of the mortgaged property before the stock had been diminished by sales therefrom, is misleading, where the testimony was that the proceeds of such sales were to be applied to liquidate the mortgage debt.

SAME—*Same—Possession by mortgagor.*—A chattel mortgage which permits a mortgaged stock in trade to remain in the possession of the mortgagor, but prohibits him from selling the goods is, on its face, valid.

SAME—*Same—Sales by mortgagor.*—A chattel mortgage on merchandise, which on its face prohibits the sale of the goods by the mortgagor, is not rendered invalid by a contemporaneous verbal agreement that the mortgagor might remain in possession of the stock, sell the same, and apply the proceeds upon the mortgage debt.  (*Rocheleau* v. *Boyle*, 11 Mont. 451. cited.)

SAME—*Same  Possession.*—Where fraud in the debt secured by a chattel mortgage, valid on its face, is the main issue, possession by the mortgagee under it is not material, for, if the mortgage was made in good faith possession was unnecessary, while if made with fraudulent intent possession could not avail him as against *bona fide* creditors.

SAME—*Possession by mortgagee—Evidence.*—The fact that the mortgagee of a stock of goods went to the store with the mortgagor and remained about an hour, but left without notifying the bookkeeper or other employes of any change of possession, or posting any signs, is insufficient to show delivery or change of possession.

SAME—*Evidence of partnership between parties.*—Evidence as to the existence of a partnership between the mortgagor and the mortgagee prior to the date of the mortgage is admissible upon the *bona fides* of the transaction.

*Appeal from Second Judicial District, Silver Bow County.*

ACTION to recover possession of a stock of mortgaged mer-

chandise. The cause was tried before SPEER, J. Plaintiff had judgment below.    Modified.

Statement of the case by the justice delivering the opinion.

Plaintiff pleads that on November 4, 1891, and ever since then, he has been the owner of certain personal property, described in the complaint; that the defendant has taken the same wrongfully and unlawfully from the possession of plaintiff; and that the value of the property is $1,500. The defendant denied the ownership of plaintiff, also the value of the property in excess of $700, and alleges that he is the sheriff of Silver Bow county; that one M. G. Cohn recovered a judgment against one Max Heilbronner; and that, as such sheriff, he levied upon the goods in question under an attachment issued in the cause of *Cohn* v. *Heilbronner;* and that the property belonged to Max Heilbronner. By replication, plaintiff affirmatively alleges that before the commencement of the action by Cohn against Max Heilbronner, on the 4th day of November, 1891, Max Heilbronner executed a mortgage to plaintiff upon the property· described in the complaint, to secure a note made by Max Heilbronner to plaintiff, dated November 4, 1891, payable nine months after date, for the sum of $1,000, with interest; that such mortgage is a valid, subsisting lien upon the property of Max Heilbronner; and that the sheriff did not pay the amount of the mortgage before making the attachment. There was a trial to a jury.

The chattel mortgage includes a horse, wagon, cash register, safe, etc., "and all fixtures and shelving and pictures, and the whole stock of nuts, groceries, and wares, of all kinds, now in the storeroom known as 'No. 50 West Park Street,' and called the 'California Market,' to have and to hold," etc. It was further provided in the mortgage that "the party of the first part [mortgagor] might remain in possession of and carefully use all of the above-described property, until default be made by the party of the first part; but if  *  *  *  prior to the maturity of the mortgage debt, the property, or any part

thereof, should be attached, seized, or levied upon by any creditor of the party of the first part, or if the party of the first part sold or in any manner disposed of said described property, or any part thereof, or if the mortgagee should at any time consider the possession of the mortgaged property, or any part thereof, essential to the security of the payment of the note, then he should have the right to immediate possession of said property, and might enter any premises where the property was,'' etc.    The mortgage was duly verified by mortgagor and mortgagee, according to the statutes, and acknowledged as required by law.

Charles Heilbronner testified that he was in possession of the property after the mortgage was given; that he went down with Max, and took possession of it; that he (Max) gave Charles possession of it, to sell the goods and get his money out of it, he thought.    This was about two hours before the attachment made by Cohn.    The mortgage was given the same day of the attachment, and was for $1,000 that Max owed Charles.    On cross-examination, the witness said that he was in possession at the time of the attachment; that he was advised, after Max had given him the chattel mortgage, to take possession until he could get his money out of it; that he went down with Max, gave orders around, saw what there was to be done, and then went off; while he was gone the attachment was levied; that he left his brother Max in possession when he was absent; that he simply went down there and told him what he wanted done; that he spoke to the bookkeeper, but did not inform him positively of his claim of possession; that there were $300 to be paid to Cohn that day by Max, and that was what he spoke to the bookkeeper Hoyt about.    There was no change of signs, and no notice of any change of possession about the place.

Plaintiff and Max Heilbronner are brothers.    Plaintiff testified that he had loaned his brother $700, from August 31, 1891, made up of sums advanced by plaintiff to his brother from time to time.    The other $300 was money loaned by the sister of Max and Charles to Max.    Plaintiff offered in evidence.

checks amounting to $535, which he had loaned to Max, and stated that the other $150 was in cash, and that there were some smaller sums besides which made up the $700. The debt of $300 loaned by the sister to Max was turned over by her to Charles, who gave her his note for $300. In that way the $1,000 was made up. Plaintiff said that he could get no money out of. Max, and, after considerable persuasion and threats to attach, Max executed the chattel mortgage; that plaintiff left Max in charge to sell the property, and turn the money over to him, and told Max not to buy any more goods than the business actually needed to keep it up; that Max was to sell these goods that were there, and put the money into the bank, and use it to pay off the accounts he had; he was to go on and sell the property or goods that were in there; that the money that was in Max's possession at the time of the mortgage, amounting to $300, was to be paid to Cohn; that the plaintiff was to take what money came in in the regular course of business, and pay himself out of it, and then take off the mortgage.. Max Heilbronner corroborated Charles about the debt due to Charles and his sister; that Cohn agreed to carry him until he had paid his. brother; that, after the mortgage was given he (Max) put Charles in possession of the place, and Charles, after staying about an hour, went away, and told Max to stay until he came back; in the interim the attachment was levied; that he intended to pay Cohn on account that day; that he supposed, when he put his brother in charge of the place, the "boys" heard what he said, but he could not say whether they did or not; that he told the "boys" that Charles was in charge of the place; that he stayed there an hour or more, and then left, "leaving me in charge to run the place till he got back."

Harry Hoyt, bookkeeper for Max, a witness for the defendant, stated substantially that he knew nothing of any mortgage upon the property, or of any change of possession; that he did not remember whether Charles Heilbronner was in the store on the day of the attachment; but that he was not notified that Charles Heilbronner was in charge, and no in-

structions in his presence were ever given by Charles to Max.

*Forbis & Forbis*, for Appellant.

The evidence shows that certain property included in the complaint, and for a return of which plaintiff procured judgment, was sold to the mortgagor upon conditional sale and was not to become his property until paid for. An outstanding title may be shown in order to defeat plaintiff's claim. (*Smoot* v. *Cook*, 100 Am. Dec. 741 and note; *Seidenbach* v. *Riley*, 111 N. Y. 560; *Dunwoody* v. *Driscoll*, 7 Mont. 394; 20 Am. & Eng. Ency. Law, p. 1106 and note.) There was no provision in the mortgage for the application of proceeds of sale to the payment of the mortgage debt. The decisions of this state have settled the question to the effect that under such circumstances the mortgage is void as to an attaching creditor. (*Leopold* v. *Silverman*, 7 Mont. 266; *Rocheleau* v. *Boyle*, 11 Mont. 451.) Therefore the mortgage will not sustain the title to any of this property, except those articles not intended for sale. The plaintiff in his complaint alleges the ownership of the property absolutely, and the defendant in his answer alleges his attachment, and not until the replication was filed, did the defendant know upon what grounds the plaintiff based his claim of title. Under such circumstances all questions of fraud are pertinent to the issue and should have been admitted in evidence. (See Am. & Eng. Enc. of Law, Vol. 20, 1106-7, and note; *Grum* v. *Barney*, 55 Cal. 254; *Humphreys* v. *Harkey*, 55 Cal. 283; *Stevens* v. *Hallstead*, 58 Cal. 193.) Upon the question as to what is necessary to constitute a change of possession under our statutes, see *Woods* v. *Buqbey*, 29 Cal. 466; *Stevens* v. *Irwin*, 15 Cal. 503; *Godcheaux* v. *Mulford*, 26 Cal. 316; *Dodge* v. *Jones*, 7 Mont. 121; *Botcher* v. *Berry*, 6 Mont. 448; *O' Gera* v. *Lowry*, 5 Mont. 433.

*L. J. Hamilton*, for Respondent.

In *Leopold* v. *Silverman*, 7 Mont. 266, and *Rocheleau* v. *Boyle* 11 Mont. 451, and numerous cases therein commented

upon, cited by appellant, either the mortgages contained a provision for sale in ordinary course of trade, or extrinsic proofs established an understanding to that effect between the parties. The authorities are practically uniform that a reservation, that the mortgagor "shall have the right to remain in possession of and carefully use all of the above-described property until default," if for the purpose of payment of the mortgage debt, would not void the mortgage lien as against other creditors, but would be consistent with the preference claim of the mortgagee, and that such purpose could be shown by parol evidence or by extrinsic proofs. (*Schwab* v. *Owens*, 10 Mont. 381; *Rocheleau* v. *Boyle*, 11 Mont. 451; *Reed* v. *Wilson*, 74 Am. Dec. 159; *Barritt* v. *Fergus*, 99 Am. Dec. 547; *Robinson* v. *Elliott*, 22 Wall. 520; *People's Savings Bank* v. *Boles*, 120 U. S. 556; *Jewell* v. *Knight*, 123 U. S. 426; *Elbridge* v. *Sperry*, 139 U. S. 266.) An enumeration of certain specific articles in a chattel mortgage also containing general description of like articles, will not prevent other articles passing under general description. (*Harding* v. *Coburn*, 46 Am. Dec. 680.) In support of the doctrine that general description of mortgaged property supplemented by parol proof of what goods were intended to pass by the mortgage is sufficient, see: *Rocheleau* v. *Boyle*, 11 Mont. 451; *Burditt* v. *Hunt*, 43 Am. Dec. 289; *Conkling* v. *Shelley*, 84 Am. Dec. 348; *Russell* v. *Winne*, 97 Am. Dec. 755; *Golden* v. *Cockril*, 81 Am. Dec. 510.

HUNT, J.—1. The defendant insisted upon the trial that there was no indebtedness from Max to Charles Heilbronner, but that the mortgage was fraudulent, and that there was no consideration therefor. We will not burden the record by stating the evidence upon this point. There was ample testimony to submit to the jury the question of the good faith of the transaction between the brothers, and upon this point defendant has not sufficient ground of complaint.

2. The court instructed the jury that if the plaintiff had a valid lien on the property of defendant by virtue of the chat-

tel mortgage, and that the mortgage was made in good faith
to secure a *bona fide* debt due by Max to Charles Heilbronner,
then the plaintiff could recover; and that a chattel mortgage,
regular on its face, properly made, executed, verified, ac-
knowledged, delivered and filed, was *prima facie* valid, and
the burden of proving that it was fraudulent was upon the de-
fendant; and that if they believed that this mortgage of Max
to Charles was made in good faith to secure a debt, and was
duly executed, then the levy made by the defendant was wrong-
ful and unlawful, and that they should find for the plaintiff.
These instructions were applicable to the issues raised on the
trial, and we think correctly stated the law.

But the court thereafter charged the jury in terms which so
conflicted with the law as above stated that we think the jury
must have been misled in their deliberations concerning the
mortgage upon the stock of merchandise.    For instance, they
were told that all the goods in the possession of Max consti-
tuting his stock in trade, and which were held as merchandise,
and offered for sale in the daily business, would not pass by
the mortgage introduced in evidence in this case if it was un-
derstood that the merchandise should remain in the possession
of Max, and be sold in the ordinary course of trade, unless it
was found from the evidence that the plaintiff, as soon there-
after as could reasonably be expected, and before such stock
had been diminished by sales therefrom, took possession of the
said property so mortgaged, in which event of such possession,
if by consent of said Max, such mortgage would pass all the
goods constituting the stock in trade.    The testimony of any
understanding between mortgagee and mortgagor being that
the proceeds were to be applied to liquidate the mortgage debt,
this instruction was very misleading.

And, again, the court charged that if, upon the execution of
the mortgage, it was agreed between the mortgagor and mort-
gagee that the mortgagor should remain in the possession of
the stock of goods, which was held for sale in the ordinary
course of trade, and if it was understood between the mort-
gagor and mortgagee that the mortgagor should continue to

sell such goods in the ordinary course of trade, then the mortgage as to the merchandise and stock in trade was void as to the creditors of the mortgagor, unless the mortgagee, before the levy of the attachment, took possession. This instruction likewise omitted the point that possession with a right to sell and apply the proceeds to pay the mortgage debt would not invalidate the mortgage.

Two theories were thus laid before the jury by the instructions: First, where the jury were told that the mortgage was entirely good; and, another, where they were told that the mortgage was void as a matter of law as to the principal item, —the stock of merchandise,—unless the mortgagee took possession, without regard to any agreement to apply the proceeds of sales to pay the mortgage debt. The jury found generally for the plaintiff, without designating in their verdict whether they found upon the theory that as to the stock the mortgage was valid, as charged, or whether it was void, as charged, but cured by virtue of possession. This conflict in the instructions, as to the stock of merchandise, was serious, for this reason: The court ought not to have told the jury that the mortgage was void on its face, unless possession was taken. On its face it prohibited the sale of any goods; therefore it was valid. The extrinsic evidence, however, tended to show that there was a verbal agreement entered into between the mortgagor and mortgagee about the time of the execution of the mortgage, to the effect that the mortgagor might remain in possession of the stock, and sell the same, accounting for the proceeds, and applying the same to liquidate the mortgage debt. This evidence in no way impaired its validity. It was still valid if such an agreement was made; and that it was, plaintiff properly assumed affirmatively to prove. The case is therefore controlled by the decision of *Rocheleau* v. *Boyle*, 11 Mont. 451, 28 Pac. 872, where it was held that a mortgage upon a stock of goods on hand at the time of the execution of the mortgage was, on its face, valid, provided the description of the stock was reasonably certain, so that third persons would be enabled to know what particular goods the mortgage

applied to. And the court approvingly quoted from *Etheridge* v. *Sperry* 139 U. S. 266, 11 Sup. Ct. 565, recognizing that a chattel mortgage on a stock of goods, where it is recited, either in the mortgage or where a parol agreement has been entered into between the parties, that the mortgagor is to retain possession with the right to sell the goods at retail, is valid, if it appear that the sales were to be for the benefit of the mortgagee.

Whether or not the mortgage was made in good faith was a question of fact, and whether or not it was agreed between the mortgagor and mortgagee that the mortgagor might sell the goods at retail, and apply the proceeds to liquidate the debt, and such agreement was a condition entered into in good faith between the parties, was likewise a question of fact. But, under the late decisions of this court, for no reason was the mortgage in this suit void on its face as a matter of law. It was sufficient in every respect *prima facie* under *Rocheleau* v. *Boyle, supra.* ''Conflicting instructions must nearly always mislead the jury, and are always good ground for reversal where they have done so. The instructions asked by the different parties to an action generally proceed upon entirely different theories of law applicable to the case, and they should be so modified and harmonized as to present the law in its proper light, or altogether disregarded, and the case given to the jury on the general charge of the court alone. (*Kelly* v. *Cable Co.*, 7 Mont. 77, 14 Pac. 633; *Flick* v. *Mining Co.*, 8 Mont. 298, 20 Pac. 807.)

The question of fraud in the debt was the main issue. This went to the validity of the transaction itself. So regarding it, in our opinion, the evidence concerning the attempted possession may have had a proper bearing upon the good faith of the mortgage entered into between Max and Charles Heilbronner; but we do not think that, if the mortgage in question was made in good faith, the possession under it was material to the case, for, if the mortgage was made in good faith, possession was unnecessary, because on its face it was valid; while, if the mortgage was made with a fraudulent

intent to cover up the stock, it gave the mortgagee no lien at all upon the stock, and possession thereof could not avail him as against *bona fide* creditors.

Upon this point, we are also of opinion that there is no substantial evidence of any actual and continued change of possession, accompanied by delivery, in this case. The mere fact that Charles went down to the store with Max is not enough. He did not even notify the bookkeeper or the other employes, posted no signs in the window, changed no signs, and did nothing, in fact, to indicate that there had been any change of possession at all of the property just previously mortgaged to him. (Comp. St. 1887, p. 653, § 226; Cobbey Chat. Mortg. § 494.) It would have been no error to have so charged the jury.

3. The court refused to permit the defendant to introduce some testimony tending to show partnership between the mortgagor and mortgagee prior to the date of the execution of the mortgage. The evidence, however, managed to get before the jury, so that the appellant was not injured thereby. Whether a partnership existed or not was collateral to the main issues, and, aside from the bearing it may have had upon the question of whether or not Max really owed Charles the money claimed by Charles, it was immaterial. Upon that point we think it was competent. So were the original mortgages to Mebus competent on that point. As we can find no way by which to reconcile the material conflict in the instructions referring to the stock of merchandise, and cannot tell upon which theory the jury proceeded, we are constrained to grant a new trial upon that issue.

4. So far as the mortgage specified chattels other than those embraced within the definition of "stock on hand," the jury must have predicated their verdict solely upon the theory that the mortgage was valid as to such items, and was made in good faith between the parties. They were not charged to the contrary.

The order will therefore be made modifying the judgment so that the plaintiff may recover those chattels, or the value

thereof, included within the mortgage, except those included in the stock on hand (and those, of course, which were held by the original mortgagor upon conditional sales, and for the value of which the plaintiff herein has filed his remittitur). The district court can properly determine from the evidence in this reccord what would be a fair value for these articles in case return cannot be had, and remit the amount of the judgment accordingly; but whether the mortgage upon the stock of merchandise was a *bona fide* transaction will have to be tried anew.   The cause is therefore remanded, with instructions to proceed according to the  views herein expressed.

*Remanded.*

PEMBERTON, C. J., and DE WITT, J., concur.